# EXHIBIT H

**46**

1     UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF CALIFORNIA
3
4  GEORGE JARVIS AUSTIN,
5          Plaintiff,
6     vs.            Case No. 3:23-cv-00067-AGT
7  TESLA MOTORS, INC. (TESLA or
8  TSLA as publicly traded), et al,
9          Defendants.
10 -------------------------------
11 VOLUME II
12     CONTINUING VIDEOTAPED DEPOSITION OF
13          GEORGE  JARVIS AUSTIN
14          Monday, August 12, 2024
15
16
17 Job No.:  549442
18 Pages:  46 - 289
19 Stenographically Reported By:
20 Alison C. Webster, CSR-6266, RPR, RMR, CRR, RDR
21
22
23
24
25

**47**

1
2
3
4      Videotaped deposition of GEORGE AUSTIN, produced as a
5  witness at the instance of the Defendant, and duly sworn,
6  was taken in the above-styled and numbered cause on Monday,
7  August 12, 2024, from 3:58 p.m. to 8:58 p.m. Eastern Time,
8  before Alison C. Webster, RPR, CRR, RMR, RDR, CSR-6266
9  (Michigan); License No. 14559 (California); License No.
10 084.004953 (Illinois); License No. 23001848 (Washington);
11 CSR-12432 (Texas), reported by stenographic method, via
12 videoconference, pursuant to the Federal Rules of Civil
13 Procedure and the provisions stated on the record or
14 attached hereto.
15
16
17
18
19
20
21
22
23
24
25

**48**

1          A P P E A R A N C E S
2
3
4  ON BEHALF OF THE DEFENDANTS
5      TIMOTHY T. KIM, ESQUIRE
6      Tesla, Inc.
7      31353 Huntwood Avenue
8      Hayward, California 94544
9      510.737.1291
10     timkim@tesla.com
11
12
13
14 ALSO PRESENT:
15 Mindy Maesato - Tesla
16 Parker Simpson, video technician
17
18
19
20
21
22
23
24
25

**49**

1          T A B L E   O F   C O N T E N T S
2
3  Witness                              Page
4  GEORGE AUSTIN
5
6  EXAMINATION
7  BY MR. KIM:                          53
8
9          E X H I B I T   I N D E X
10
11 Exhibit                              Page
12 (Exhibits attached to transcript.)
13
14 EXHIBIT 1                            58
15 Defendant Tesla, Inc.'s Notice of
16 Continued Deposition of Plaintiff
17 George Jarvis Austin and Request For
18 Production of Documents
19 EXHIBIT 2                            68
20 Email, Re: 100k Deliveries!
21 TESLA_GA000045
22 EXHIBIT 3                            76
23 Email, Re: Badging Issues Follow Up -
24 Vince Woodard, TESLA_GA3252 - 253
25

**50**

```
1       E X H I B I T   I N D E X   C O N T I N U E D
2
3   EXHIBIT 4                          80
4   Court Ordered 2-Page Letter of Numbered
5   Claims
6   EXHIBIT 5                          223
7   George J. Austin, esq. (TBA) LinkedIn
8   profile
9   EXHIBIT 6                          230
10  Document, Case Summary
11  EXHIBIT 7                          231
12  Document, Select A Case
13  EXHIBIT 8                          273
14  11-6-2019 message from Elisa
15  Lopez-Minera, TESLA_GA000086 - 095
16  EXHIBIT 9                          281
17  Email, (Question) Re: Security
18  Reminder: Confidentiality
19  TESLA_GA000530 - 533
20
21
22           REQUESTS TO MARK TRANSCRIPT
23
24  TRANSCRIPT MARKED BY MR. KIM        186
25
```

**51**

```
1            DEPOSITION OF GEORGE AUSTIN
2              Monday, August 12, 2024
3
4       VIDEO TECHNICIAN:  Here begins the
5   continued deposition of George Jarvis Austin in the
6   matter of George Jarvis Austin versus Tesla Motors,
7   Incorporated, et al, in the United States District
8   Court, Northern District of California, Case Number
9   3:23-cv-00067-AGT.
10      Today's date is 8-12-2024.  The time on the
11  video monitor is 15:58 Eastern Standard Time.  The
12  remote videographer for today is Parker Simpson,
13  representing Planet Depos.  All parties of this video
14  deposition are attending remotely.
15      Would counsel please voice-identify
16  themselves and state whom they represent.
17      MR. KIM:  Timothy Kim on behalf of the
18  defendant Tesla, Inc.
19      MR. AUSTIN:  And George Jarvis Austin,
20  plaintiff, self represented.
21      VIDEO TECHNICIAN:  The court reporter today
22  is Alison Webster, representing Planet Depos.  The
23  witness will now be sworn.
24      STENOGRAPHER:  The attorneys and Mr. Austin
25  are participating in this deposition, and Mr. Austin
```

**52**

1 has verified the spelling of his first and last name.
2       In lieu of an oath administered in person,
3 the witness will visually affirm his testimony in this
4 matter is under penalty of perjury.
5       The parties and their counsel consent to
6 this arrangement and waive any objections to this
7 manner of reporting or admissibility of the
8 transcript.
9       If there are any objections to proceeding
10 in this manner by any party, please state so now.
11       Hearing no objections, Mr. Austin, would
12 you please raise your right hand.
13       Do you swear or affirm the testimony you
14 are about to give in this matter will be the truth,
15 the whole truth, and nothing but the truth?
16       MR. AUSTIN:  Correct.  Yes, I do, as I did
17 in the docket and the previous deposition as well.
18       STENOGRAPHER:  Thank you.
19       You may proceed.
20       MR. KIM:  Okay.  Good afternoon,
21 Mr. Austin.
22       THE WITNESS:  Good afternoon.
23       GEORGE AUSTIN,
24 was thereupon called as a witness herein, and after
25 having first been duly sworn to testify to the truth,

**53**

1 the whole truth and nothing but the truth, was
2 examined and testified as follows:
3              EXAMINATION
4 BY MR. KIM:
5 Q.  So like the deposition last week, one thing that's
6     really important to take note of before we start is
7     that the stenographer, the court reporter, can't write
8     down everything that we're saying if we talk over one
9     another, and so it's really important that we try our
10    best -- you know, we're human beings, and so I'm sure
11    we'll make mistakes from time to time, but overall,
12    it's really important that we try our best not to
13    speak over one another and to take turns speaking so
14    we can get a clean record.
15       Does that make sense to you?
16 A.  For sure.
17 Q.  Okay.  Mr. Austin, do you understand that you are
18    under oath?
19 A.  I do.
20 Q.  And do you understand that you are participating in a
21    deposition today?
22 A.  Yes.
23 Q.  And do you understand that means you are here to
24    answer my questions?
25 A.  Yes.

62

1  Q.  Do you remember the name of the staffing agency?
2  A.  Yes.  So they -- they had a few different names, but
3      when -- when I initially made contact, it was with
4      Balance Staffing.
5  Q.  And do you recall who your contact or supervisor was
6      through Balance Staffing?
7  A.  They had a few different contacts there, so I
8      wouldn't necessarily say "supervisor" because when
9      I -- the supervision came through Tesla, so they were
10     more just like a partnering thing to set you up with
11     Tesla.  Tesla was the supervisor and the manager and
12     the report team, so...
13 Q.  Do you recall who any of those individuals were?
14 A.  Through Balance?
15 Q.  Correct.
16 A.  Yeah, a few of them.  I mean, some of the -- some of
17     the names, because you -- when I first came and made
18     contact with them I spoke with, you know, probably
19     about seven different people, so there was a lot of
20     different people there to deal with.  And so through
21     email, some in person, but, yes, the -- the primary
22     controls and the people who I dealt with day-to-day
23     were all in Tesla.
24 Q.  Yes.  So could you tell me the names of the
25     individuals from Balance Staffing that you

63

1      communicated with, to the best of your ability?
2  A.  The one that I had the most communication with would
3      probably be Sandy.
4  Q.  Could you spell Sandy's name for us?
5  A.  S-a-n-d-y.
6  Q.  And what was Sandy's last name?
7  A.  I don't have it offhand, but I just remember -- I
8      remember Sandy.
9  Q.  And what was Sandy's job at Balance Staffing, to the
10     best of your understanding?
11 A.  I don't know what her full role was, but she was
12     part -- she was part of the people who gave the spiel
13     about, you know, what Tesla offered and, you know --
14     and so, kind of, recruitment stuff and just
15     understanding what the job entails and partnering in
16     terms of, you know, placing talent with, essentially.
17        So I don't know if you call that a
18     recruiter.  I don't know if you would call that a --
19     you know, a HR person or human personnel person but,
20     you know, she put the people with the -- with the
21     company.
22        She helped do that, but she did it more on
23     the front end.  The backend stuff, I'm not sure who
24     does what exactly within their company structure, but
25     once you got past that it was all Tesla after that,

64

1      so...
2  Q.  And when you started at -- your work at Tesla, you
3      were provided a Tesla email address.  Correct?
4  A.  Correct.
5  Q.  And did you use that email address?
6  A.  I did.
7  Q.  And you used that to communicate with other employees
8      at the company.  Correct?
9  A.  Correct.
10 Q.  Are you still in possession of any of those emails
11     that --
12 A.  No.
13 Q.  Mr. Austin, just let me finish my questions before --
14 A.  Oh, okay.  I'm sorry, I thought there was a pause
15     there.
16        Go ahead.  Yes.
17 Q.  Yeah.  Are you in -- are you still in possession of
18     any of these emails that you sent or received while
19     you were on your assignment at Tesla?
20 A.  So -- so that's still the same answer, no.  Part one
21     of the adverse acts, once I made a formal report and
22     complaint about the labor code violations that were
23     happening was the HR person ordered that my email be
24     disconnected, so I didn't have access.
25        But that was one of the adverse -- one of

65

1      the first adverse acts that happened once my badge --
2      first was the badge disconnect where I couldn't gain
3      access physically to the building, and then the
4      second one was, like, email disconnect, so that was
5      one of the first things that happened.  I haven't had
6      access to it since then.
7  Q.  Okay.  At some point during the course of this lawsuit
8      Tesla produced emails to you as a part of the
9      discovery.  Correct?
10 A.  Correct.
11 Q.  And did you review all of the emails that Tesla
12     produced in discovery?
13 A.  For -- see, I had a question about that, but I want
14     to say, for the most part, to my understanding, yes.
15        But when you resent them we had a
16     conversation back and forth where the initial person
17     you had send the emails, there was more emails in the
18     first one than there was in the second one, so there
19     was some of those -- you know, there were several
20     hundred emails that were missing or exhibits that
21     were included within that 300 I think -- was it about
22     3,300 pages of documents?  So there was a section
23     that was missing in the second production that you
24     sent that was supposed to be a resend of the first
25     one.

66

1    So I reviewed, but I can't be sure if
2 that's all of the ones that you had in your possession
3 because there was some missing items there, but from
4 what I saw, what I received, I reviewed all that.
5 Q. Okay. And did those -- did you see in those emails
6    that there were emails that were to and from your
7    email address while you were at Tesla?
8 A. That's correct. Yes.
9 Q. And did those emails appear to be the emails that you
10    had, in fact, sent or received while you were working
11    at Tesla?
12 A. Yes. I -- I believe there might have been some
13    missing. Like, I could tell that even from the flow
14    of the conversation it seemed like there was some --
15    there was some missing pieces within there, and
16    there's some -- there's some parts of the formal
17    complaint that I -- that I made that weren't included
18    in that, that were missing as well, but I think that
19    might -- I'm not sure if that's the information
20    management system not catching everything within
21    Tesla.
22    I know there was an issue with me not
23    retaining some of those Kronos records that were --
24    that are, you know, specified by the labor code for
25    current employers to retain, so I'm not sure why

67

1 that's not there, but I could tell that there was
2 some -- like, there's part of the formal complaints
3 that I made when I was going up the chain of command
4 that I could tell it was kind of blurry there, and
5 there might be some pieces missing, but for the ones
6 that I saw, I did send those for sure.
7 Q. Okay. So I'm going to show you one of those, and what
8    we're going to do is this basic process called
9    authentication. So I just need to know whether or not
10    you're taking the position that some emails are
11    doctored or not or whatever. So I just want to
12    confirm that we're going to agree that these emails
13    are your emails.
14    So I'm going to show you one of them, and
15    then I'm going to show you a couple more. But if at
16    any point -- for the record, Mr. Austin, just based
17    off of your review of the emails so far, do you have
18    any reason to believe that any of those emails had
19    been altered or, for whatever reason, inauthentic?
20 A. I don't want to say "inauthentic," but in terms of
21    information retention within Tesla in accord with the
22    labor code, one of the contentions within the lawsuit
23    is that the per se violation of the labor code was
24    the failure to retain -- well, I know the information
25    was retained, but to retain certain records within

68

1 the specific time frame that the labor code requires
2 to maintain both for the personnel record as well as
3 for just the recordkeeping stuff.
4    So, like, for example, the hours that were
5 worked -- besides the hours that were worked, that's
6 all within the Kronos system. And then it should be,
7 like, pro forma to keep those for three years because
8 that's what the labor -- the federal labor code and
9 the California Labor Code require, but that wasn't
10 retained.
11    So that should be a part of the information
12 that was produced but it wasn't, so within that --
13 within that same train of thought if that was
14 violated, then I'm sure that there might be some other
15 holes there in terms of -- I'm not going to say
16 they're inauthentic, what was -- what was retained,
17 but I know that there was something that should have
18 been kept that perhaps wasn't kept for a variety of
19 reasons.
20 Q. Okay, so I'm going to show us the second document for
21 today that I'm going to mark as Exhibit Number 2.
22    MARKED FOR IDENTIFICATION:
23    EXHIBIT 2
24    4:19 p.m.
25 BY MR. KIM:

69

1 Q. Mr. Austin, is the email popping up on your screen
2    now?
3 A. Yes, but the same -- same issue as before, the font
4    is really, really small, so...
5 Q. Okay. So I'm going to scroll in just to the bottom
6    email. Is that easier to see now?
7 A. Somewhat. I still -- I still would have trouble
8    reading it, so --
9 Q. Oh, no problem. I can -- I can keep on scrolling.
10    How about that?
11 A. Okay. That's a little better there, yeah. Yep.
12 Q. Okay. So, for the record, Exhibit Number 2 is a
13    document Bates labeled TESLA-GA000045.
14    Mr. Austin, do you see the Bates label
15    number at the very right bottom corner where it says
16    TESLA_GA?
17 A. Yes.
18 Q. And so these are one of the documents that have been
19    produced to you as a part of the lawsuit. Correct?
20 A. Correct.
21 Q. And I'm going to look at the first email in this
22    thread. This is an email from Mr. Elon Musk to
23    Everybody@Tesla.com. Correct?
24 A. Correct.
25 Q. Okay. And I'm going to go to the next email, which is

70

1  from you. It says, "From: George Austin," and then
2  it says, in brackets, "[C], on behalf of George
3  Austin," brackets "[C]," and then it says,
4  "geaustin@tesla.com."
5  A. Uh-huh.
6  Q. Mr. Austin, was that your email address while you were
7  working at Tesla?
8  A. From my understanding, yes.
9  Q. And --
10 A. I'm not sure if there -- I'm not sure if it would --
11     what was represented to me in the system was that
12     email address, yes.
13 Q. Okay. Do you recall having any other email handle
14     other than geaustin@tesla.com?
15 A. No, not to my understanding.
16 Q. Okay. And so this is an email from you to Mr. Musk.
17     Correct?
18 A. Correct.
19 Q. And you're responding to the email that he had sent
20     out to everybody?
21 A. Yes.
22 Q. Okay. And do you see where it says "bcc"?
23 A. Yes.
24 Q. Are you familiar with what "bcc" is?
25 A. Is it blind carbon copy?

71

1  Q. Yes. Although I'm not the one testifying, but, yes,
2     it is. It sounds like you're familiar with it.
3     Right?
4  A. Yes.
5  Q. And is that something that you would do while you were
6     using your email at Tesla, which is to blind copy
7     people from time to time?
8  A. Sometimes I would. Sometimes -- that -- that
9     actually was probably intended to be a "cc," not a
10    "bcc," just looking at the email.
11        But when I'm -- when I'm sending -- you
12    know, if I'm on a break or if I'm in a position where
13    I can send one, sometimes the -- it's hard to
14    manipulate, I have big hands, so sometimes I intend
15    to click it one way and then it will click on the
16    other one.
17        Some of the emails, you'll notice that I
18    have, like, typos and stuff like that in it because
19    I'm sending it from my phone, so that -- it wasn't --
20    it probably wasn't an intentional bcc, it was
21    probably a cc, but yeah.
22        Sometimes I would include other people if
23    the information was relevant in some way to that
24    person, you know, just to include them in the
25    conversation.

72

1  Q. Okay. I'm going to go through the recipients on the
2     bcc with you really quickly. The first one, it says
3     your name again, George Austin, gaustin07@gmail.com.
4  A. Uh-huh.
5  Q. Is that one of your personal Gmail accounts?
6  A. Yes.
7  Q. Okay. And Joseph Genson, is that an employee at
8     Tesla?
9  A. Yes. He was one of the supervisors, if I'm not
10    mistaken.
11 Q. And then --
12 A. At least at that time. I'm not sure what his
13    position is now.
14 Q. And then Mozell Turner, is that also a supervisor at
15    Tesla?
16 A. That's correct.
17 Q. And then I see you bcc'd yourself at your Tesla email;
18    is that right? That's next.
19 A. It looks -- that looks like -- well, I can't actually
20    see it. Oh, yeah, I see it down there, yep.
21 Q. And then the next email that I see is
22    gaustin07@yahoo.com. Is that another email address,
23    personal email address that you maintain?
24 A. Correct.
25 Q. Okay. So why did you send this email, Mr. Austin, to

73

1  yourself at gaustin07@gmail.com and
2  gaustin07@yahoo.com?
3  A. Sometimes it -- it might have been an auto add.
4     There's -- there's -- you know, some of the things
5     that I work on, it -- it -- they're related to
6     something else or I'm trying to document something
7     just for my own knowledge for future reference, and
8     sometimes it's an auto add. I can't be precise at
9     this time whether I did it for some reason or if I
10    did it just as an auto-add kind of situation.
11        But I probably included the supervisor --
12    the supervisors just to let them know that I made
13    that communication so they didn't think I went over
14    their head to speak with them because I had also been
15    in communication with the head of the department and
16    other leadership, which they say to do in the
17    personnel, but I also try to include people that I
18    communicate with regularly when I try to do that so
19    that they don't think that I'm trying to backdoor
20    them or, you know, do something that's not
21    straightforward or straight-up.
22        I'm trying to avoid the appearance of
23    being shady, so I let people know when I'm talking to
24    their supervisors or to somebody who can influence
25    their outcome and their work environment, even if

74

1    something -- you know, it's just to say, thank you, I
2    appreciate the opportunity to work here.
3  Q.  Do you still have access to gaustin07@gmail.com and
4    gaustin07@yahoo.com?
5  A.  I believe so. Some of them I don't use very often,
6    so I believe I do, but I -- I would have to
7    double-check some of them.
8  Q.  Did you delete any of the emails that you sent to
9    yourself from your Tesla account to either of these
10   two accounts?
11 A.  I have an auto delete for some of them, and then for
12   some like my Berkeley addresses, they -- they did a
13   massive deletion for a lot of the information that
14   was there just because they did a -- a -- what is it
15   called? A reduction in the data availability for the
16   users. So a lot of the stuff just got deleted
17   automatically from there, so...
18 Q.  So you're saying that emails sent to your Gmail
19   account, your Yahoo account, and/or your Berkeley
20   account, may have been deleted.
21 A.  Yes. Some of them are auto delete. Like some of
22   them I set up just as a way to not over -- you know,
23   overrun my inbox. It's like after a certain point it
24   just auto -- you know, I set it up where I -- I can
25   just cut off a whole bunch of stuff.

75

1    This thing with Berkeley was actually
2    systematic where they said, we want all of our users
3    to have only this amount -- this amount of gigs, and
4    so they cut -- you know, anything that was in the
5    way, it got cut out.
6  Q.  Okay. Did you do anything to ensure that your
7    Tesla-related emails to any of these accounts were not
8    deleted?
9  A.  I can't say for sure because the ones that I had
10   previously included were the ones that I thought were
11   relevant, so all the other ones, I don't know if --
12   if they weren't relevant, if they were something that
13   was like either not important, it was private
14   information, it was something like that where I would
15   have an objection to it, then I didn't worry about
16   it. But anything that was relevant to this
17   situation, I tried to keep an eye on it or include it
18   or document it somewhere.
19    But outside of that context, I didn't go
20   through -- I don't have the tools to go through like
21   you did to have, like, a massive kind of search
22   situation, so I didn't go out of my way to delete
23   anything and I didn't go out of my way necessarily to
24   be extraordinarily precise while I was going through
25   everything I was going through in my personal life,

76

1    including injury and all that kind of stuff, to
2    maintain, kind of, one-off email situations, so...
3  Q.  Okay. So I'm going to show you another document,
4    which is going to be Exhibit Number 3.
5  A.  Uh-huh.
6      MARKED FOR IDENTIFICATION:
7      EXHIBIT 3
8      4:28 p.m.
9 BY MR. KIM:
10 Q.  So Exhibit Number 3 -- marking as Exhibit Number 3 is
11   a document Bates labeled TESLA_GA3252 --
12 A.  Uh-huh.
13 Q.  -- to 3253.
14      Mr. Austin, I'm going to zoom in for you so
15   you can read it. So there are multiple emails on this
16   thread. I'm going to focus first on the first one.
17   Do you see that first email dated January 15th, 2020,
18   from you to a variety of individuals, including
19   Brandie To and Vincent Woodard?
20 A.  Correct.
21 Q.  Okay. And this is one of the emails that Tesla had
22   produced to you in discovery. Correct?
23 A.  Correct.
24 Q.  And do you recognize this email that you sent on
25   January 15th, 2020?

77

1 A.  Yes. If you can blow it up a little bit more I could
2   read it a little bit better, but, yeah, generally
3   speaking, I -- I -- it looks familiar.
4  Q.  Okay. And so this is an email that you sent to
5   various individuals, I guess, following up regarding
6   badging issues; is that right?
7  A.  Let me see...
8  Q.  Would you like me to scroll down at all?
9  A.  Yes, so I can read it and I can verify. Because you
10   asked a precise question about what it was referring
11   to, and I just want to make sure I -- before I say
12   yes or no, that I can read through it. Can you blow
13   it up a little bigger?
14 Q.  Yeah.
15 A.  Oh, yes, this was the first adverse action. Correct?
16   Or this is -- wait, "I went to badging and called
17   security, and they said to follow up" -- "Jeremy" --
18   "I am a bit more" concerned -- yes, yep, very
19   familiar with this.
20 Q.  Okay.
21 A.  So this is after -- this was after the first adverse
22   action -- or the first or second adverse action I
23   experienced where I came to the building. I was -- I
24   met -- I had already escalated the formal complaints
25   to Vincent Woodard.

**78**

1  I -- I was instructed by the previous head
2  of the department to speak with, I believe, Brandie.
3  She suggested that I speak with Vincent. When I met
4  with HR, I believe he's a senior -- he was a senior
5  HR personnel person or leader, officer. I'm not sure
6  if he's still there now.
7  But when I -- after the escalation, I went
8  in to report to him. And after I made the formal
9  report and I came in -- because I used the facility
10  for a lot of different things. I came in to check --
11  and I went to the badging, and the badge didn't work.
12  And then this was the follow-up after that.
13  Q. Okay, and then I'm going to go to the next email.
14  This is an email from Mr. Woodard to you dated
15  January 15th, 2020. Do you recognize this email?
16  A. Yes.
17  Q. Okay. And then I'm going to go to the next email.
18  And it's dated January 16th, 2020, and it's from you
19  back to the same group of individuals --
20  A. Uh-huh.
21  Q. -- including Vincent Woodard and Brandie To. I'm
22  going to give you a chance to read this one as well,
23  and then I'm going to ask you if you recognize it and
24  if you sent it.
25  A. Yes.

**79**

1  Q. So, yes, you recognize it, and, yes, you sent it.
2  A. Correct.
3  Q. Okay. Thank you.
4  So, Mr. Austin, I believe one of the claims
5  that you are alleging is -- you know what? Strike
6  that.
7  Okay, so, Mr. Austin, as part of the
8  Court's order, you were instructed to file a two-page
9  document detailing out your claims and supporting
10  allegations. Do you recall that order?
11  A. Yes.
12  Q. And I believe you submitted three separate versions of
13  that document. Does that sound accurate?
14  A. I would have to review to see if they were -- if they
15  were separate versions, but they were -- they were
16  filings that were different for sure.
17  Q. Yes. So I want to ask you which one, according to
18  you, is the operative one -- you know one is the correct
19  one that we should be using. Do you recall which one
20  that is or is it just whatever was the latest one that
21  was filed?
22  A. I believe the latest one would probably be the one
23  that seemed like it was more in tune with what was
24  being asked, and so I wasn't sure, based on the way
25  it was presenting initially, how much detail should

**80**

1  be included, and I believe that's what I would have
2  to review, but I believe that's what the reason for
3  the amended versions of that was to get more to the
4  nuts and bolts of the central claim, so...
5  Q. Okay. So I'm going to go mark this as Exhibit
6  Number 4, and this was the -- and I'll represent to
7  you this was the latest filing you had that details
8  your claims in the two-page fashion instructed by the
9  court.
10  MR. KIM: So marking as Exhibit Number 4 is
11  the document entitled, "Court Ordered 2-page Letter of
12  Numbered Claims," Docket Number 140-3.
13  MARKED FOR IDENTIFICATION:
14  EXHIBIT 4
15  4:34 p.m.
16  BY MR. KIM:
17  Q. Mr. Austin, do you recognize this document? And let
18  me know if you need me to scroll.
19  A. Yeah, can you blow it up a little bit?
20  Q. Absolutely.
21  A. Correct.
22  Q. Okay. And so these detail the specific causes of
23  action that you're asserting against Tesla. Correct?
24  A. Correct.
25  Q. Okay. And so I'm going to focus first on cause of

**81**

1  action Number 2. Do you see that, where it says "42
2  USC 1981"?
3  A. Yes.
4  Q. Okay. And so I want to ask you about exactly what
5  you're alleging there.
6  So under 42 USC 1981 there are a number of
7  different types of claims that you can raise, so I'd
8  like, if you don't mind, for you to specify what
9  claims you're raising under 42 USC 1981.
10  A. Okay. Can you blow -- can you blow up that document
11  a little bit?
12  So -- so just to make sure, you're asking
13  me to highlight what I -- what I listed here, or are
14  you saying to say it in a specific kind of way?
15  What -- what are you asking exactly?
16  Q. Sure. Sure. So 19 -- 42 USC 1981, it's a pretty
17  broad statute, it can encompass a lot of different
18  things.
19  A. Right.
20  Q. From my read of what you put here, it seems to me that
21  you are asserting a race discrimination claim --
22  A. That's correct.
23  Q. Okay. Are you asserting any other claims under 42 USC
24  1981 aside from your race discrimination claim?
25  A. Not -- not with 42 USC 1981.

82

1  Q.  Okay.
2  A.  This is all through the lens of race on that one.
3  Q.  Okay.  Got it.  So one of the distinct claims under 42
4      USC 1981 aside from race discrimination is also a
5      separate cause of action for race-based harassment?
6  A.  Uh-huh.
7  Q.  Are you also asserting that under Cause of Action
8      Number 2?
9  A.  And when you say that, are you including -- are you
10     including hostile work environment as part of
11     harassment?
12 Q.  Yes, I'm using those two terms interchangeably.
13 A.  Okay, yes, so hostile work environment is part of
14     that cause of action.
15 Q.  Okay.  So your cause of action under 42 USC 1981
16     includes claims for race discrimination and race-based
17     harassment or hostile work environment; is that
18     correct?
19 A.  That's correct.
20 Q.  Is there anything else you're asserting under 42 USC
21     1981?
22 A.  So the -- so this is where I'm -- I'm a little bit
23     not clear on exactly what you're asking because from
24     the pleadings -- from the description here, I'm
25     trying to think if there's anything that would be --

83

1      that would need to be encompassed in a different
2      category than those two that you just mentioned.
3          So I don't want to leave anything out
4      because, to me, it's like when I say -- when I think
5      about it, I think about it as almost a overlapping
6      thing, so I don't -- I want to be -- make sure that
7      we're on the same page, but you don't see that there
8      should be another category.
9          What other categories from -- from your
10     lens that you see 42 USC 1981 outside of hostile work
11     environment or racial harassment and race-based
12     discrimination?  Are there other categories that you
13     feel are relevant here that I should highlight as
14     well?
15 Q.  Well, so, Mr. Austin, I can't give you legal advice,
16     particularly not in a deposition.
17 A.  Well, no, let me --
18 Q.  But I will -- but I will represent to you, Mr. Austin,
19     that based off of my understanding of your claims --
20 A.  Uh-huh.
21 Q.  -- which I -- you've now confirmed, that was our
22     reading, is that you're alleging two separate claims
23     for race discrimination and then for harassment, but
24     it seemed like you put it just under a single cause of
25     action for number 2, and so I was confirming that you

84

1      are raising two distinct claims and not just one.
2  A.  And I guess the reason why I put it as one is because
3      some of the things overlap one another.  For example,
4      the repeated use of derogatory stereotypes combined
5      with the substandard treatment or, you know, inferior
6      treatment, were interrelated in a sense that I
7      wouldn't necessarily know where that was coming from
8      without the other thing.
9          So I didn't view them as necessarily
10     distinct and different when thinking about them as a
11     whole.  I viewed it as race-based harassment or
12     race-based discrimination, I should say, and then the
13     hostile work environment is part of what illuminated
14     the -- the motivating factors for that as well.
15         So if that helps you, you can put them as
16     two distinct things, but for me I saw it as an overall
17     experience of discrimination.  So that's why it's --
18     it's all lumped under 1981.
19 Q.  Okay.  And I want to focus specifically on the
20     harassment claim.
21 A.  Uh-huh.
22 Q.  Do you allege that you were harassed by any Tesla
23     employees while you were working there?
24 A.  So I -- I alleged there was a hostile work
25     environment where there was repeated use of

85

1      derogatory stereotypes, derogatory slurs, name
2      calling, and that as part of the, kind of, normal
3      environment, that was -- that was in the backdrop.
4      Right?
5          So -- and then, yes, in the sense that I
6      was discriminated against by several different
7      employees with substandard treatment, in addition to
8      that racialized backdrop where that was a norm for
9      people who look like me to be treated that way.
10 Q.  So I'm going to first ask you about what you testified
11     earlier about the derogatory stereotypes, derogatory
12     slurs and name-calling.
13 A.  Uh-huh.
14 Q.  And then I'm going to ask you about the individuals
15     that you believe subjected you to substandard
16     treatment.  So let's first just talk about the first
17     subject.
18         So who subjected you to derogatory
19     stereotypes, derogatory slurs, or name-calling?
20 A.  So that was, as testified by many who work there and
21     who happen to be Black as well, or African American,
22     that was just in the environment.  Right?
23         So you could be walking around.  I used
24     the eating area.  I used the workout space.  I used
25     the showers and the -- and the personal gym area.  I

102

1  Q.  Yeah.
2  A.  In the sense of supervisors, they were all -- they
3     were all Tesla folks, so Mozell, Jose, and Joe -- I
4     believe his name was Joseph, was some of the overtime
5     that I would report to, that we had a good rapport
6     with, but those are, like, the three main ones in
7     terms of immediate supervisors.
8  Q.  Do you recall Mozell's last name?
9  A.  I believe it was Turner.
10 Q.  And do you remember Jose's last name?
11 A.  Yes, it's -- it's in the email.  I'm trying to think
12    of it.
13 Q.  Does Mendiola sound correct?
14 A.  Yeah, that's correct.  That's correct, yeah.
15 Q.  And is it Joseph Genson?
16 A.  Yes.
17 Q.  Did you report to any --
18 A.  You know --
19 Q.  Go ahead.
20 A.  Yeah, I reported to all of them.
21 Q.  Did you report to anybody else other than those three
22    individuals?
23 A.  Yes, so there's -- there's the AMs that are above
24    them, and so I would report to them sometimes as
25    well.  So when -- if you notice, with my timecard,

103

1     when I was pointing out that there were recordkeeping
2     issues, you'll notice that Mark says, "I'm passing
3     your timecard down to Jose," when we were going back
4     and forth, line by line over specific dates where
5     there were some errors in Kronos.
6        And so Mark had to pass the timecard down
7     to him because Mark had direct access to it, so I
8     would report to Mark and to Jose, but Jose was the
9     direct report.  Mark would check in periodically, but
10    Jose was the direct report.
11 Q.  Okay.  After you heard -- so we -- we talked about the
12    first time you heard the N-word with the "er."  I
13    think you testified it was during training.  And then
14    you testified you did --
15 A.  Within that week.  Within that week, yes.
16 Q.  Yeah, I believe you -- and then you testified that you
17    did not report that, and you provided some long
18    testimony providing context why you didn't report it.
19    When you -- when you continued to hear the N-word with
20    the "er," did you at some point report that to
21    anybody?
22 A.  I -- I talked about it informally, but it wasn't like
23    a -- it wasn't the same level of formal report as I
24    did with the labor code stuff later on, so that was
25    something concrete that I could say, okay, this is

104

1     wrong and I need this corrected.
2        I didn't know fully how to approach the
3     other stuff because a lot of it -- if somebody had
4     came out and said it directly to me, then I would
5     have a specific person to point to and say, this
6     person did this to me, X, Y, and Z.
7        But the other context was more of the work
8     environment, and it was hard to contextualize it, and
9     I didn't have the precise names and all that kind of
10    stuff.  I would have had to do a lot of investigatory
11    work to get all that stuff to be able to present
12    that.
13       Now, later on, I was going to.  You know, I
14    was -- that was part of it.  But I wanted to start
15    with something concrete and say, here's something I
16    know is wrong, let's fix this, and then I can talk to
17    you.
18       Once the lines of communication are open I
19    can start sharing with you some of the more fuzzy
20    things that are still just as damaging, but I don't
21    have the concrete stuff to bring to you at the front
22    end.
23       So I started with something more concrete,
24    and then I was planning on working towards some of the
25    other issues that I was dealing with as well.

105

1  Q.  Got it.  Okay.  So your testimony is -- and you can
2     please correct me if I'm wrong -- is something to the
3     effect of, you didn't have enough specifics yet to be
4     able to report it, and there was a lot of other issues
5     that you were reporting to the company instead that
6     you were more focused on.  Does that sound about
7     right?
8  A.  Yeah, and I -- and it's not because they weren't
9     equally important, it was just because I didn't have
10    as much detail and information to be able to feel
11    comfortable saying, these specific things are what
12    need to be fixed for this.  You know what I mean?
13       I could come in there and say, yeah, I'm
14    hearing the N-word a lot, that's a problem.  And then
15    they would ask me, well, who did it and when, you
16    know what I mean, and I wouldn't have the -- a lot of
17    the concrete information at that point to be able to
18    do a full followup, at least from the way I thought
19    about it.
20       So I was looking at something concrete
21    versus to say, okay, I know this is off, I know these
22    are errors, and I would like to fix it.  And I tried
23    to fix it at the lowest possible level before
24    escalating it, but I was looking for something
25    concrete because the other stuff I was trying my best

106

1    not to focus on as much because of the purpose that I
2    was there for, so...
3 Q.  Got it.  So is it your testimony that you don't recall
4    the specific identities or names of any individuals
5    who used the N-word with an "er"?
6 A.  Yeah, and a lot of them weren't in my -- or almost
7    all of them weren't in my specific work area.  It was
8    a lot of times in the shared space or en route to
9    other spaces, so it would be hard for me to know all
10   of those people at the very beginning.
11        If I had been, you know, a long-term Tesla
12   employee, I could probably even by -- by face, you
13   know, know who was talking to who after a period of
14   time.  But because I was so new at some of the
15   earlier points and then even later on, it wasn't a
16   lot of people necessarily in my immediate, you know,
17   workplace structure.
18        And the way it's set up is that, you know,
19   even when your -- even when you get to know your --
20   your rotational folks, you don't necessarily work at
21   the same time with all the different people.  So even
22   if some of them said it away from me, I wouldn't
23   necessarily have that information and data readily
24   available for that.
25        So my -- so what I'm saying is, my

107

1    testimony, to answer your question, is that when I
2    heard it, a lot of times I wasn't in the place and I
3    hadn't had the information available to know exactly
4    who said what, when, and where to be able to bring
5    forward that information in a formal complaint that I
6    felt would be able to solve the issue.
7        You know, I could give some generalized
8    statements, but it wasn't -- it wasn't concrete enough
9    compared to the other information that it had that I
10   knew was wrong to bring a formal complaint in that
11   way.
12 Q.  Okay.  And other than the N-word ending in an "a" and
13   the N-word ending in an "er," do you recall any other
14   derogatory slurs or racially based name-calling during
15   the time you worked at Tesla?
16 A.  I'm sure there were, but those are the ones that --
17   that stick out to me.
18        Like, I read through what the other
19   gentleman Owen experienced, and -- and I didn't have
20   to that extent, where somebody targeted me with the
21   precise, you know, variations of the word or, you
22   know, the -- the -- I think he had the, you know,
23   drawings and a whole bunch of nooses and that kind of
24   stuff.  I didn't have that experience in that way.
25   What I did have is hearing those variations and a ton

108

1    of it where I was treated as if that -- the same kind
2    of way.
3        So my experience was slightly different in
4    that way.  It wasn't as personalized in terms of
5    someone directly over me calling me that in that way,
6    but it was the overall work environment being hostile
7    in the same kind of way.
8 Q.  Got it.  Did anybody -- just to clarify for the
9    record, so did anybody at Tesla call you a derogatory
10   stereotype or slur or a name that was racially
11   discriminatory?
12 A.  Yes.
13 Q.  Okay.  Tell me who that was.
14 A.  So it -- with the complaint, if you notice, I was --
15   I was called, essentially, a criminal.  And so it --
16   when I -- when I made the formal complaint about
17   labor code violations, recordkeeping violations, and
18   some of the other issues that I was dealing with in
19   response to that, there was no effort to, you know,
20   figure out, you know, what the problem was within
21   Kronos to follow up and have any kind of thing.
22        It was brushed off and I was called a
23   criminal who violated the penal code, and -- and there
24   was a -- you know, a pretext that was made up to call
25   me that -- for a Black person, especially in this day

109

1    and age, that's a derogatory term is just to presume a
2    Black man is a criminal, especially in the context of
3    the overrepresentation of Black men in jail.  It's
4    like -- so that was derogatory.
5        And then once that was treated like that, I
6    was just treated that way from then forward, and that
7    was the premise of being blackballed.  So the reason
8    why it didn't jump off the page to me that that's
9    where that was coming from is because, you know, it --
10   it -- you know, I try to -- I try my best not to jump
11   to conclusions.
12        I try to think about the best in other
13   people and I try to figure out, okay, maybe I'm doing
14   something wrong, let me try to fix this, let me try to
15   fix that.  If you notice with some of the email
16   communications that I do, I ask a lot of questions.
17   That's because I'm trying to get to, like, let's get
18   past whatever this impasse is and let's get to solving
19   the problem.
20        So it takes me a while sometimes to
21   realize, like, oh, this person just presumes this
22   about me.  I didn't do anything, I don't deserve this
23   kind of treatment.  I can't make -- I can't convince
24   another person to think well of me if they already,
25   you know, prejudge and decided this person is not a

110

1  good person for whatever reason.
2       In this context, because of the -- you
3  know, the racial atmosphere and -- and the full
4  context of how it happened, I -- I -- you know, I
5  started meditating and thinking about it, okay, I can
6  see it.
7       And then when you -- when you shared some
8  of the emails, seeing the back conversation I was
9  like, oh, wow, they really did just presume that, you
10 know, because in my entire time working in my
11 professional career -- I started working, you know, in
12 my teenage years -- I've never recorded anybody.  I've
13 taken good notes, but I never recorded anybody.
14      So to have that be a pretext that was just
15 made up, in context of me making a formal complaint,
16 that's already in the environment of, you know -- you
17 know, hostile environment, and I'm trying to go
18 forward and -- and avoid stuff that's squishy and try
19 to be very concrete on, this is a problem, how do we
20 fix it, and be professional.  It was very insulting
21 and derogatory to just presume, you know, one of the
22 worst --
23      I mean, being -- being presumed a criminal
24 is so bad.  It's -- you know, it's one of the things
25 that you don't have to explain in defamation.  It's

111

1       just, it is what it is.  You know, if you presume
2  somebody and treat them like that, that's considered
3  per se a -- a statutory violation.
4       So that's one of the worst character traits
5  in our society, especially for Black people, because
6  when you look at the 13th Amendment, right, in the
7  context of emancipation for Black people, that's one
8  of the few areas where if you're considered a
9  criminal, you can be made a slave in a sense.  Right?
10      So it's -- it's like this applies to all
11 Black people who are previously enslaved except for
12 these folks, and so to presume that about a Black
13 person is one of the worst insults ever.  You know?
14 It's a modern day way of saying N-word in this
15 context.
16      So -- so in that sense, yes, I was -- I
17 was -- that was a derogatory slur directed directly at
18 me that was in writing as well.
19 Q.  So just to clarify, did somebody specifically call you
20     a criminal?
21 A.  Yes.  So the HR person that I referred -- that I made
22     the -- the report to apparently was the one who
23     ordered the blacklisting or the -- the -- ordered all
24     of the follow-up adverse actions, the seven adverse
25     actions that I listed in the file, on the docket, and

112

1  apparently they're the ones who said I was a criminal
2  as well.  Right?
3       So they said it in context -- they said
4  that -- I think that the specific language was that I
5  recorded -- it's a -- California is a two-party state,
6  Mr. Austin recorded without permission and violated
7  the criminal code, and thus is a criminal.  And
8  because he's a criminal and violated and did these
9  actions, we're going to treat him like this now.
10      But the premise was wrong.  I never
11 recorded anybody in my entire work history.  So the --
12 the presumption of me being a criminal and violating
13 the criminal code, and then the actions that followed
14 that were all based off of presumption because I never
15 recorded anyone.
16      So -- so that -- that -- at that precise
17 moment where -- where he made a presumption, he
18 didn't -- he -- see, the thing is, is when I came in,
19 I asked the question over and over, as you saw in the
20 writings, you know, do I need to prepare anything; do
21 I need to do anything.  And they said, no, it's all
22 about you.  It's all about the concerns that you had
23 brought forward.
24      I had -- I had a documented history of the
25 labor code thing that was going on, the recordkeeping

113

1  issues that were off.  I was trying to get those
2  corrected.  And then people started -- some of the
3  managers started acting weird and I was like, yeah,
4  that was weird.
5       So then I -- I started, you know, including
6  some of the weird stuff that was happening with that.
7  I didn't jump to conclusions about why it was
8  happening, but it was weird.  And so when I went in
9  there he said, this is all about you.  I said, do I
10 need to do anything else?  He said, no, this is --
11 this is just here for you.
12      I said, is this a punishment?  This is just
13 for you.  And it's not -- it's not punishing you.  You
14 did nothing -- he said explicitly, you did nothing
15 wrong, and we're just going to follow up and try to
16 get it done.
17      And so after I made my formal complaint it
18 was like, oh, man, you shouldn't have to deal with
19 that, why don't you take the rest of the day off.  And
20 it was positive.  So -- and he said, and I'll follow
21 up with resolving your complaint.
22      So it was all about my complaint and the
23 issues I experienced.  And then to see the writing
24 afterwards where he presumed something negative about
25 me, and he could see me writing in pencil, and there

**114**

1    was no — no recording whatsoever.
2         At the time he never came up — he never
3    even asked me, somebody mentioned something about you
4    recording, have you ever recorded anybody.  He never
5    even asked me the question.  He just presumed, that's
6    what he did, and presumed it was a legal violation and
7    presumed that I did it and then called me a criminal
8    and then blacklisted me afterwards or blackballed me
9    afterwards.
10  Q.  So --
11  A.  So that's — that is a derogatory thing.
12  Q.  Okay, thank you for that explanation.  I actually have
13    a more narrow followup, which is whether or not some
14    person directly called you a criminal.  Right?
15         I'm not asking you if somebody referred to
16    you as a criminal in an email.  Did anybody at Tesla
17    say to you that you are a criminal, or something to
18    that effect?
19  A.  So — so after the — after the email where he
20    ordered that, you know, that followup, then he —
21    then his admission — and the admission was through
22    the conduct afterwards.
23         So he called me a criminal to colleagues
24    of mine.  Right?  Because he — when he was ordering
25    the blacklisting and ordering the adverse action,

**115**

1    that was the premise that he repeated over and over
2    throughout the company as the basis of doing all
3    this.
4         Because, again, I was performing well.  I
5    had got, you know, commendations or positive remarks
6    from all of my people that I was working around, both
7    colleagues as well as supervisors.  I even had people
8    who were saying I was — you know, to take — you
9    know, in a indirect way or sometimes in a direct way
10    that I was, you know, way overqualified for the
11    position that I was in and I should be working at a
12    much higher level.
13         So everybody I dealt with, I was getting
14    positive feedback from.  I didn't have my — my direct
15    supervisor had even showed me the notes about me in my
16    personnel file, and they were all positive.  And then
17    he reiterated from him that it was positive.
18         And so to have that kind of shift where I'm
19    making the report there's something going wrong, I'm
20    trying to follow the personnel guidelines that Tesla
21    puts out how to say this is what you're supposed to
22    do, right, it's supposed to be a positive when you
23    catch that we're doing something wrong and you bring
24    it forward.  And then he said in writing, he called me
25    a criminal, and then after that he said, you know, the

**116**

1    actions said it as well as the followup for the
2    justification said it.
3         But it was -- it was interesting because he
4    was kind of a two-faced person because he didn't come
5    out and say, George, you recorded, this is why I'm
6    doing this to you.  Right?  Or, George, you're a
7    criminal, this is why I'm doing this to you, directly
8    to me.  If you look at his back-and-forth
9    communications with me, he was very -- he was kind of
10   hiding behind not saying it.  Right?  He said it
11   clearly to other people, but he didn't say anything to
12   me.
13        So part of the reason why it took me so
14   long to figure out what was actually happening is
15   because I wasn't -- I was directly communicating, but
16   people weren't directly communicating with me, so I
17   didn't even have any way of saying, hey, you can
18   check -- whatever -- whatever you can check -- I
19   didn't do anything.  I didn't have a chance to even
20   offer a different perspective or anything, it was just
21   presumed that that's what I was.
22        So I wish -- I wish I could say, yeah,
23   someone said, George, you're a criminal, and this is
24   why we're doing this.  Right?  Because then it would
25   have been cleaner because then I could have responded

**117**

1    back directly to that and then we would have had the
2    whole chain.
3        But the — the deceit part of it is that it
4    was all behind my back and I'm having to figure out,
5    what the hell is happening here?  This is crazy.
6        So I was confused, quite frankly, for a
7    long time because I didn't know what was going on, and
8    I'm like, yo, I'm being straight up and I'm just
9    trying to solve a problem.
10        There's a whole bunch of other stuff I
11   could have complained about but I'm trying not to
12   bring into this because I'm trying to make it as clean
13   as possible to focus on the issues that I can quantify
14   and issues that I can solve on a more immediate basis.
15   And after we solve those, then we get to the more
16   fuzzy stuff.
17        But, yeah, that was the strangest — the
18   strangest — it — it felt like a setup.  It felt like
19   it was — like a decision had already been made in
20   somebody's mind about how the outcome should be based
21   off of what happened afterwards.  I'm not going to say
22   that was the way it necessarily was at the beginning,
23   but there's no way that that outcome comes unless you
24   have a presumption or you're looking for something to
25   just make it go away.

118

1  You know, something bad happened, we don't
2  want to deal with that, we're going to use this as the
3  justification. You know, wars get started like that.
4  You know, you create a false pretext, you go to war
5  for something and find out ten years later it never
6  existed. You know what I mean? So it felt like
7  that -- that was just something to -- to justify a
8  behavior that had already been made up in somebody's
9  mind.
10  And that, too, is part of the retaliatory
11  or discriminatory animus that was displayed because,
12  you know, the -- once you make a formal complaint
13  there should be some kind of --
14  Q.  Okay, Mr. Austin, I'm going to have to cut you off.
15  A.  Okay.
16  Q.  We've gone very far away from the question I asked
17  you, and I need to check in -- I need to check in with
18  the stenographer and videographer.
19  MR. KIM:  Are you guys doing okay?
20  I want to go a little bit longer before we
21  take another break just so we can finish this section,
22  but I want to make sure you-all are during all right.
23  [Nonverbal reply]
24  BY MR. KIM:
25  Q.  Okay, Mr. Austin, so I need to circle the wagons.

119

1  Like, I need to find out all the ways in which you
2  believe that you were harassed by employees at Tesla.
3  You've already testified to the general
4  work environment.  You testified that you believe that
5  you were harassed because Mr. Woodard, or other
6  individuals, presumed that you were a criminal and
7  referred to you as such, or something to that effect,
8  to other folks internally.
9  Were there any other ways that you believe
10  that you were harassed by somebody at Tesla on the
11  basis of your race?
12  A.  Yeah, so the blackballing afterwards, the treatment
13  afterwards as part of -- although that's -- that in
14  some ways you could say that's disparate treatment in
15  the sense of --
16  Q.  Okay.  I'm going to stop you right there.  I'm so
17  sorry.  So blackball -- I'm going to get a list --
18  A.  Okay.
19  Q.  -- just so I can get the whole universe, and we're
20  going to let these folks take a break.
21  Blackballing.  Right?
22  If there's nothing else, we can -- we can
23  jump into the blackballing, but I just want to confirm
24  that really quick.
25  A.  Yeah, let's jump into that, and if something else

120

1  comes up I'll bring that forward as well.
2  Q.  Okay.  So before we go into blackballing, as of right
3  now, you can't think of anything else.  Right?
4  A.  I would have to -- I would have to refer to the --
5  when we take a break, I'll review some of -- some of
6  the writings and I can bring it forward then.  But
7  for right now, let's just go with that.
8  Q.  Okay.  Let's do the blackballing and let's take a
9  break.  Go ahead, Mr. Austin.
10  A.  In terms of racial harassment?
11  Q.  Yes.  Tell me how you were harassed by employees at
12  Tesla by being subjected to blackballing.
13  A.  The -- the context of the -- that's where the context
14  of the hostile environment, the existing hostile
15  environment plays a big role in that because after --
16  you know, that's the context, I'm making a complaint
17  in an environment that's already hostile towards
18  Black people, that creates kind of an ecosystem of
19  where it's difficult to bring complaints forward,
20  it's difficult to address situations, it's
21  difficult -- people make complaints about racial
22  harassment and they don't get -- they don't get dealt
23  with even when they're very specific.  Right?
24  So that's the full complaint, so I'm
25  bringing forth in that context as a Black man issues

121

1  of how other rights -- and it -- you know, were
2  violated for me, and then the response is not, okay,
3  this is how personnel, you know, our policies, we are
4  going to address it, this is the law, we're going to
5  address it.  It's like, no, you brought it forward,
6  now you're a criminal, and now we're never going to
7  allow you to come in here physically again.
8  I -- I think there was a -- there was a --
9  they wanted to escort me out, and there was no --
10  there was no fight or anything.  I just came in like I
11  normally do.  They wanted to escort me out with police
12  presence, they wanted to try to publically embarrass
13  me.  They never listed the order to blackball, which
14  is to put my name on the list and say, he can never
15  come in here again.  And then the communications, all
16  communications they ordered to not respond to me.
17  So even the stuff that -- like, with the
18  labor code personnel file where I was supposed to get
19  that within a three-year time period, right, in case
20  something comes up, they were ordered on that premise
21  to not respond, and that's all -- that's all in that
22  writing as well.  So the blackballing was based off of
23  the derogatory racial slur and stereotype that I was
24  called, and from then until now, that's what he's been
25  going off of.

122

1 Because he's this, we can do all these
2 other things to him and we are going to do it to him
3 and we have done it, and we documented that we did it
4 to him. So that's -- that's where the blackballing
5 fits into that context.
6 MR. KIM: Okay, why don't we take a break
7 and come back at 2:30. Does that work for everybody?
8 THE WITNESS: Yes. For me, at least.
9 MR. KIM: Okay, let's go off the record.
10 VIDEO TECHNICIAN: We are going off the
11 record, the time is 17:22.
12 (Off the record at 5:22 p.m.)
13 (Back on the record at 5:31 p.m.)
14 VIDEO TECHNICIAN: Back on the record. The
15 time is 17:31.
16 BY MR. KIM:
17 Q. Okay, Mr. Austin, do you understand that you are still
18 under oath?
19 A. Correct.
20 Q. And is there any reason why you can't continue to
21 provide your best and honest testimony?
22 A. No.
23 Q. Okay. So before we broke for a break, I asked you to
24 take some time to think about any other ways in which
25 you believe you were harassed by employees at Tesla on

123

1 the basis of your race. Could you recall any other
2 instances or examples?
3 A. So we have blackballing, we have the name-calling,
4 and we have the adverse actions more towards the
5 intentional discrimination or the disparate
6 treatment.
7 I think those would probably be the
8 primary ones right now to come up. I didn't have a
9 chance to read through some of the stuff that I --
10 that I wrote down, but off the top of my head, I
11 would say those are the primary ones that I -- that
12 come up based on our conversation right now.
13 Q. Okay. So sitting here now, there aren't any other
14 ways in which you were harassed that you can recall?
15 A. At this moment, yeah, I would say that.
16 Q. Okay. And I think we had some unclear testimony of
17 the N-word with the "er" versus the "a." I think -- I
18 want to just clarify for the record, in terms of the
19 way in which you -- you contextualized your, you know,
20 not reporting the usages of those words at the time,
21 it applies both to N-word with the "a" and N-word with
22 the "er." Right?
23 I think originally I had just been asking
24 you about "er," but N-word with the "a" also in a
25 derogatory fashion, you also did not report that at

124

1 the time. Correct?
2 A. At the time, that's correct.
3 Q. And I think we covered this, but I wanted to make
4 sure. You said something to the effect that at
5 least -- at the very least, nobody on your team had
6 used those words; is that right?
7 A. Well, I'm not going to say they --
8 Q. At least to you or what you witnessed. Correct?
9 A. Exactly. That's what I was getting at. Yeah. Part
10 of the structure of the work environment, the
11 rotation is that you're usually only working with,
12 like, one other person at the time, so it's just you
13 and that other person. It would get awkward really
14 quickly, you know, unless somebody wanted that kind
15 of, you know, environment to -- to -- to jump into
16 that.
17 So a lot of people, based off just the way
18 I conducted myself and the fact that one of the
19 supervisors, the way they -- they established
20 themselves as well as a person of color, as a Black
21 man, they -- it created a work environment in the
22 immediate setting that perhaps was a little different
23 than a lot of other environments where might have
24 tolerated that a little bit more.
25 So because one of the supervisors was a

125

1 Black man, I think in the immediate work environment
2 people knew better in some ways because he was a Black
3 man with self-respect, and that kind of thing, to then
4 breach that topic, as well as to me personally, a lot
5 of people wouldn't just come up and call me that in a
6 general sense.
7 So I think that combination made it less
8 likely in my immediate work environment to hear it as
9 much as I did when I went outside of that immediate
10 work environment where the context is different,
11 leadership structure is different, and the -- and
12 the -- the cultural awareness and context and the
13 culture of the leader themselves is different in that
14 way because Tesla is a very, you know, white company,
15 so, you know, it's rare to see Black people or Black
16 men in those leadership positions throughout the
17 company.
18 So I was -- I was fortunate in that way in
19 my immediate work environment where I had some of
20 that, which probably shielded me from a lot of the
21 stuff in my immediate everyday -- because that kind of
22 would have been the norm when I -- the stuff that I
23 heard when I walked around, what I was describing
24 earlier would have probably been more the norm in my
25 immediate work environment had it not been for that

126

1 context as well, as comfortable as everybody else was
2 outside of that context, so...
3 Q. Okay. So as far as you recall, none of your direct
4 supervisors at Tesla had used that kind of language
5 towards you.
6 A. Not the N-word. Not -- not that I know of. Not that
7 I know of. Yeah.
8 Q. Well, the N-word or any other racially derogatory
9 language?
10 A. Well, so the -- the racially derogatory language at
11 the point in which I was -- I made the report and I
12 was retaliated against, based on that, I'm not
13 exactly sure the full context of that.
14       So I can't -- I can't give a pass at that
15 point because the -- the racial slur, the derogatory
16 term of "criminal" in that context, I'm not sure the
17 full context of that, so at that point, you know,
18 they -- because I made the -- I made the initial
19 reports to my immediate supervisor and to his
20 supervisor and then went up the chain of command,
21 they had a responsibility to intervene or to do
22 something, which they did not do, because they
23 were -- they were aware ahead of time of what the
24 problem was.
25       And so when that happened, you know, I'm

127

1 not sure who's culpable and who's fully responsible
2 because if -- if they didn't believe that, they said,
3 hey, George is a good person, they heard that, they
4 should have -- somebody should have stepped in and
5 said, we know why he came in there, that had nothing
6 to do with that blah, blah, blah. So a lot of people
7 can be responsible at that point.
8 Q. Got it. Okay. But aside from that testimony -- and
9 thank you for -- for bringing that context. Aside
10 from that testimony, none of your super -- none of
11 your supervisors, at least, at Tesla, had used
12 racially derogatory language towards you?
13 A. To my knowledge in my presence, that's all I can say.
14 I don't -- I don't -- because -- because the
15 information you shared showed that there was a
16 two-facedness throughout the time period where I'm
17 being told one thing and then behind my back this
18 stuff I have no idea what was said behind my back,
19 but nobody said it to my face in that -- in that way.
20 Q. Got it. And then you had never seen any of your
21 supervisors at least use that language towards anybody
22 else as far as you can recall?
23 A. Not in my presence. Not in my presence.
24 Q. Okay. I think we can move on from this topic, so
25 thank you, Mr. Austin.

128

1       So earlier you were testifying about
2 complaints that you had made related to FLSA
3 violations; is that correct?
4 A. Right.
5 Q. And you referred to at least one meeting when you
6 conveyed these concerns to Mr. Woodard; is that right?
7 A. That's correct.
8 Q. Do you recall how many meetings that you had with
9 Mr. Woodard about the subject?
10 A. Well, I only had one meeting with him period. So the
11 first time I met him was the only time I met him. We
12 spoke on the -- on the -- via email a few times back
13 and forth leading up to the conversation, and in that
14 that's when you see me cc'ing other people because I
15 already had made formal complaints about the FLSA and
16 the state labor code violations that we were
17 concerned about and that I wanted to get fixed. And
18 so by the time it got escalated to HR officer
19 Woodard, senior HR officer Woodard, it had already
20 been discussed, rehashed, tried to figure out a way
21 to do it.
22       And they had the capability. Mark had the
23 capability. Said he handed it over to Mr. Mendiola.
24 And neither one of them corrected the -- the
25 recordkeeping, labor code recordkeeping issues. And

129

1 so when it got escalated to Mr. Woodard, that was the
2 only time I dealt with him.
3 Q. Okay.
4 A. So yeah.
5 Q. Okay. Well, we'll work backwards.
6 A. Okay.
7 Q. So we'll start with Mr. Woodard's meeting and then
8 we'll kind of work our way backwards. So tell me what
9 you remember about that meeting with Mr. Woodard?
10 A. So it was -- so when -- the first thing, it was weird
11 how it happened. So I had been communicating with
12 him, and I -- I had personally went out of my way to
13 escalate it.
14       There was another context where other
15 leadership had suggested for me to go in for, you
16 know, a higher position going for promotion, and so
17 it was a very positive kind of conversation about why
18 I was going to talk to HR in the first place.
19       When the -- when the issue didn't get
20 resolved at the lowest level possible for the labor
21 code stuff, then that became part of the escalation
22 conversation to Mr. Woodard, but initially I was
23 thinking it was going to be solved at the lower level.
24 So when I met with Mr. Woodard, it became weird
25 because the -- my immediate supervisor started acting

138

1  tolerate the pain, which is what the reports show.
2  You know, the pain level in a sitting position, in an
3  elevated position, is fairly low, but when I'm
4  standing on it the pain level is extremely high. You
5  know, I can't last longer than 15, 20 minutes without
6  feeling sharp pains everywhere.
7       So I've been going back and forth with the
8  Tesla medical staff, and they've been -- you know,
9  they've been ordering tests and I've been going
10 trying to figure out they -- you know, they're giving
11 me the basic stuff about, you know, rest,
12 compression, ice, elevation, and I'm doing all the
13 things, and I have a modified work schedule, but
14 they're not giving me the information I need to do so
15 that I can go forward if I need to, you know, get
16 some extra care, if I need to figure out what's going
17 to do if I'm -- you know, other medical.
18      You know, people say they're not telling
19 the truth, you got -- you tore a ligament or
20 something, you know, I need to know that. But I'm
21 not getting the proper collaborative work environment
22 that an ADA situation is supposed to do.
23      Now I am getting -- the one good thing I
24 was getting was that I had a modified work schedule.
25 So I give them credit for that. Because what they did

139

1  is they say, we recognize that you're injured. You
2  can sit down for the majority -- so that we had a
3  modified rotation for all the different locations that
4  I was placed at for that time period were locations
5  where you can sit for the majority of the time.
6       So that was a good thing that they did
7  because they knew I was injured and they knew what was
8  going on, and we had back-and-forth communications
9  throughout the time I was there. But the bad part
10 was -- is, like, yo, the information I need you're not
11 providing me so that I can make good choices and get
12 better as fast as I can because I don't want to be
13 injured any more than you want me to be.
14      You know that I mean? Nobody wants to be
15 injured. So but I need the information so that I can
16 take the proper steps and precautions so that I can
17 put myself in the best position to be.
18      So when they lied about it, I also reported
19 that too. I said -- I asked for my medical records,
20 and I wasn't given that. I asked for the reports, I
21 wasn't given that. And, you know, blase blah. And --
22 and, you know, when I -- when I -- all of that
23 combined is what he was responding to when he said,
24 you shouldn't have to take this. Take the rest of the
25 day off and go to the medical clinic.

140

1  Q.  Okay. Got it. Anything else --
2  A.  I think that's the --
3  Q.  -- that you were talk -- you talked about with
4      Mr. Woodard?
5           Go ahead. Sorry. I didn't mean to cut
6  you off.
7  A.  Oh, no, I didn't -- no, I cut you off. Go ahead.
8  Q.  Yeah, yeah. Anything else other than these additional
9      issues that you brought up? The -- you said the lack
10     of communication and the fact that you weren't able to
11     get these medical records and reports. Was there
12     anything else that you brought to Mr. Woodard's
13     attention during this meeting?
14 A.  Yeah, that they weren't being honest about it.
15 Q.  Yeah.
16 A.  So I was asking -- you know, they -- they said they
17     were going to make a change for the Kronos where I
18     was -- they knew I was here, they knew I was on time.
19     They knew the system, for whatever reason, had a
20     glitch in it or there were some errors and they were
21     going to change it, and he said he was working on it,
22     he didn't make the change.
23          So I was reporting that -- so it was not
24     just that there was a recordkeeping error, I was
25     reporting that they said they were going to make the

141

1  change and they didn't make the change, which is why
2  I need to escalate it to you.
3       They also said -- when I was saying that I
4  complained and said they told me it was -- it was the
5  secret to tell me that it was -- that my own patient
6  records were somehow privacy protected from me, when
7  I'm the patient for a physical injury.
8       And I also need to report because I don't
9  need just, you know, what the -- what the injury
10 reports say from the medical staff, but I need what
11 Tesla is telling them. So let's say I have to go get
12 some other kind of care and help that requires some
13 kind of -- I need all that information so that I can
14 go forward and I know what's happening.
15      They -- they were not willing to provide
16 it and they were telling me stuff that wasn't true,
17 so I reported that as well. And then I also reported
18 that I had asked for my personnel file because it
19 started -- when I -- when I saw kind of the
20 connective tissue I was like, okay, they're not --
21 they're not doing what's going on with the labor code
22 here, they're not doing what's going on with the --
23 with the other stuff, the injury, the OSHA stuff. I
24 started asking for my personnel file as well.
25      So when I -- by the time I escalated it, I

142

1  had been asking for a while. It was already due
2  December. And so when I escalated it, I -- that was
3  also part of the ask and part of the complaint, it's
4  to say I want my personnel file because he showed me
5  my positive notes.
6      He showed me, you know, the -- the good
7  things that were being said, the positive way I was
8  received, but their behavior, especially when that
9  immediate shift happened where it was kind of weird
10 and I was saying, why are they acting like this, and
11 he -- he said, they're acting weird, I asked him also
12 for the personnel file because I wanted documents to
13 understand like --
14     In case something weird happened -- I
15 wasn't thinking that it was going to end like that or
16 they were going to react like that afterwards, but I
17 was just trying to understand the full context of it
18 to get all the information I needed so that I could
19 be proactive in solving the issues that I was dealing
20 with.
21     So those were the -- the, you know,
22 primary points that I brought to the table at that
23 time. But I was expecting there would be a followup,
24 not that that would be the last conversation.
25 Q.  Were there any other points that you remember bringing

143

1  up to Mr. Woodard's attention that you can recall
2  right now?
3  A.  Those -- those are the most relevant ones. And I
4  will -- I'll -- I'll review that as well, and if
5  there's some other stuff, I -- I can bring you that
6  in the future as well.
7  Q.  Okay. But at this time, these are the ones that you
8  can recall. Correct?
9  A.  Those are the most important ones, yeah, I would say.
10 Q.  Okay. Yeah, I'm sorry, not the most important ones.
11 I just mean the ones that you can actually remember.
12 A.  Yeah, yeah, yeah.
13 Q.  Okay.
14 A.  Because, I mean, I might -- we might have had small
15 talk at the beginning where I said, hey, how's your
16 day, how you doing. You know what I mean?
17 Q.  Yeah.
18 A.  So I'm not -- I'm not bringing up all the little
19 small talky stuff.
20 Q.  Got it. Got it. Okay.
21 A.  But the main points, yeah.
22 Q.  Good. So other than Mr. Woodard, did you make
23 complaints or raise issues regarding FLSA violations
24 with anybody else?
25 A.  Yes, Jose, Mark, which is his supervisor. There's

144

1  a -- there's a email where I escalated it up the
2  chain. I included Bert, but I think he had already
3  moved on, so his emails were getting forwarded to
4  somebody else. He was -- he was initially the
5  vice -- he was the head of the production department.
6  So the head of -- whoever replaced him as the head
7  of -- I think it might have been Jerome. He was -- I
8  think he was included. And eventually, after, you
9  know, I escalated with Vincent Woodard, I escalated
10 up to Elon Musk as well.
11 Q.  And who is Mark?
12 A.  Mark is Jose's boss.
13 Q.  Do you recall Mark's last name?
14 A.  I do, but it's slipping my mind right now, but
15 it's -- it's -- it's -- if you look in the email,
16 there's a Mark that's included, it's him.
17 Q.  Okay. Okay. And were you raising the same issues
18 that you brought up to Mr. Woodard?
19 A.  Yes. So I start -- I actually started with Mark.
20 Mark then referred me to Jose. And there's an email
21 conversation where I think -- where you -- where you
22 see there's a red -- where Jose wrote in red that was
23 kind of like line by line back and forth.
24     The previous email to that one was Mark
25 saying, I'm now passing your Kronos access file to

145

1  Jose, so he's going to have the ability to make the
2  corrections and controls. I had it previously, now
3  Jose has it, talk to Jose. So then I talked to Jose
4  directly, and that's when we went back and forth to
5  get it corrected.
6  Q.  Did you ever speak with Mr. Musk or with Mr. Bruggeman
7  about your FLSA complaints other than including them
8  on emails?
9  A.  So not -- not -- not specifically. I didn't -- I
10 didn't have an opportunity to speak with Mr. Musk
11 about any of the complaints at all except for
12 including him on the email, so I never -- I -- I
13 didn't speak face-to-face with him in that context.
14     With Mr. -- with Bruggeman, Bert, I -- I
15 gave him context of where I was and -- and at the
16 time, when we met initially, it was more of a very
17 positive -- you know, he was, you know, very praising
18 and encouraging and saying, you know, all these great
19 things, and he also said I was too smart for the
20 department.
21     And he started making introductions to the
22 legal department and other -- other folks in
23 different places where he said, you know, based on
24 your background and your intelligence and your
25 character and all that stuff you can do a bunch of

146

1  things, so I want you to meet, you know, some
2  different folks in different departments so you can
3  expand your mind out of this -- although it was no
4  disrespect -- he was saying, no disrespect to the
5  department that you're in, but we can utilize
6  different skill sets that you have already in
7  different departments.
8      So when I met him initially, that's how
9  the conversation started with him. So there was --
10 there was no, like, negative at that point to come up
11 -- to come out, and I had -- although I noticed some
12 of the issues, I didn't really fully pay attention to
13 how they were planned out until I kept seeing other
14 errors come out.
15     So later on down the line is when I
16 started noticing. I'm like, hey, man, this is not
17 going away. I figured like an internal system would
18 have self-corrected it. So then when I started
19 complaining later on, I included him in the email.
20 And then when we talked outside of it, I gave him
21 some more context to it, and that's when he suggested
22 that I talk to Brandie as well as -- and then Brandie
23 went to Vincent after that.
24     So I gave him a little bit of context when
25 we talked outside of that, but it wasn't necessarily

147

1      the initial conversation or the initial point of the
2      conversation.
3  Q. Do you recall an individual named Steve Anderson?
4  A. Oh, did I say "Mark"?
5  Q. Yes.
6  A. I meant to say -- yes. I -- I don't know why in my
7      mind he's a Mark. With the hat -- he had a hat.
8      But, yes, Steve Anderson is the gentleman I actually
9      was referring to.
10 Q. Got it.
11 A. Yes.
12 Q. He was the one that Mr. Mendiola reported to.
13     Correct?
14 A. Exactly. I don't know why, in my mind, I associated
15     him with a Mark, but, yes, Steven.
16 Q. It's a lot of names. It's easy to forget.
17 A. Yes. Steve Anderson is the correct name, yes.
18 Q. Okay. So you had conversations with both Mr. Anderson
19     and Mr. Mendiola about the issues that you have been
20     testifying about. Correct?
21 A. That's correct. That's correct.
22 Q. And did you ever meet with them in person to discuss
23     these issues?
24 A. Yes, in person, via email. Those are the two main
25     ways, yep.

148

1  Q. Do you recall when you spoke with either Mr. Anderson
2      or Mr. Mendiola about these issues?
3  A. So as soon as they emerged, I would have informal
4      conversations about stuff because they were the
5      direct people that I dealt with more -- I dealt with
6      Jose mostly, and then I met Mr. Mendiola. And then I
7      dealt with Mr. Anderson on a more sporadic basis
8      because he was higher up than --
9          So he was responsible for more of the AM
10     -- I mean, you know, Tesla structure, so his
11     responsibility was more than just our unit. He was
12     above a few other areas as well, from my
13     understanding.
14         And so I would check in with him as things
15     came up on an informal basis, like the policies
16     recommend to do, but then when it -- when it didn't
17     get resolved and it didn't, then I started
18     documenting in terms of written conversations more
19     because it started off where I would just ask, hey, I
20     need this; hey, I need that; hey, this is wrong,
21     and -- and they wouldn't -- things would
22     get criticized.
23         So it triggered me to start writing
24     everything down, the email version, take notes, what
25     have you, best way to do it, so that that way we have

149

1      some kind of written record to go back and say, okay,
2      we said this on this day, did that get fixed. And a
3      lot of stuff didn't get fixed no matter how much I
4      wrote down, so...
5  Q. Okay. And I want to move on to your fourth cause of
6      action, which is --
7  A. Uh-huh.
8  Q. -- a cause of action for personnel records under Labor
9      Code Section 1198.5. You're familiar with that labor
10     code section. Right?
11 A. Personnel file, yes.
12 Q. Yes. And you're still -- you still maintain that you
13     are owed these records. Correct?
14 A. Oh, for sure. Correct.
15 Q. Okay. What records -- well, how about this. At some
16     point Tesla did produce to you a significant amount of
17     records related to your work at Tesla during the
18     course of the litigation. Right?
19 A. Yes.
20 Q. And after receiving those records, do you still
21     believe that you are owed additional records under
22     Labor Code Section 1198.5?
23 A. Yes. So there's -- so Tesla produced after they were
24     ordered to produce. Although the general order for
25     the Northern District said that they already had to

150

1  produce it, the Court had to order that.
2        But before that point, the labor code
3  section that you cite says that the worker, either in
4  a joint employee or employer situation or a singular
5  employer situation, are entitled to certain records
6  including their performance evaluations, their -- all
7  their timekeeping, recordkeeping information, which
8  is the Kronos files for Tesla, and all the other
9  stuff like OSHA, injury records, all that stuff,
10 injury reports, that's all encompassed in the
11 personnel file.
12       That -- that file is primarily controlled
13 by Tesla. The -- the staffing agency didn't have any
14 kind of say in how Tesla managed itself, how Tesla did
15 the recordkeeping stuff, how they reported the injury,
16 how they did all that. That all came through Tesla,
17 primarily, and they were responsible for those primary
18 records in maintaining them up to three years after
19 separation from Tesla, according to the law.
20       Both -- both the stuff that's specified in
21 the personnel file as well as the federal labor code
22 recordkeeping requirements that are also supposed to
23 be for three years, so all that stuff together is
24 supposed to be what's in that personnel file.
25       So those -- the things that I mentioned

151

1  that were -- that were missing like the Kronos files,
2  the Kronos records, those are -- those are per se
3  violations according to current law. So those things
4  when you don't maintain them for a certain time period
5  under federal law and under state law, those are
6  per se violations of the labor code because the labor
7  code instructs and orders, even under the guidance
8  from the Department of Labor, explaining what the
9  rules mean, they say that you have to do this for all
10 joint employees -- or joint workers so as a joint
11 employer. So all of those personnel files that are
12 included in that, I am owed, and I only got part of
13 that stuff and they didn't produce it.
14 Q.  Okay. So what records do you believe that you still
15   are entitled to that you have not yet received?
16 A.  The -- some of the injury stuff, the reports that --
17   the OSHA, OSHA reports, all of the -- all of the
18   Kronos reports were not included. None of them were
19   maintained for the -- for that time period.
20       And so the -- the recordkeeping stuff in
21   that space, and then the performance evaluations and
22   all that stuff that I had -- that I asked before I
23   was even separated from, that should have all been
24   included in that because he showed them to me so I
25   knew they existed. When the information was

152

1  produced, none of that stuff was there either.
2  Q.  Did you ever receive a formal performance review while
3    you were working at Tesla?
4  A.  Informal, not -- not formal. But -- but with that
5    informal, when I was asking questions, he showed me
6    the notes that were being taken and all of the -- the
7    feedback that was given. And so there was nothing
8    negative in the entire report.
9  Q.  And who's "he," if you don't mind me asking?
10 A.  Mr. Mendiola.
11 Q.  And did you ever request records from Balance
12   Staffing?
13 A.  They didn't -- they didn't have it. They were --
14   from what I was asking -- what I was asking --
15 Q.  But you did request them?
16 A.  No, no. What -- no, no. I'm saying -- I'm saying,
17   the records that I requested, they don't have -- they
18   didn't have them. Those -- those would be primarily
19   in Tesla's control.
20 Q.  Oh, okay. So that wasn't my question. I was just
21   asking is, did you ever ask them if they could provide
22   you personnel records?
23 A.  I didn't -- the -- the records that I were interested
24   in, they -- they didn't have, so I didn't ask them.
25 Q.  Okay. So you never requested personnel records from

153

1  Balance Staffing. Correct?
2  A.  I didn't -- because once I got hired from Tesla,
3    Tesla -- you know, Tesla the -- was who I dealt with,
4    so I only dealt with Tesla on that basis going
5    forward.
6  Q.  And so at no point have you ever requested personnel
7    records from Balance Staffing. Right?
8  A.  No.
9  Q.  Or any of these other records that you're -- that you
10   believe you're entitled to. Correct?
11 A.  Yeah, so the -- the records that I'm -- that I'm
12   bringing forward in terms of the complaint, those
13   were certainly obtained, maintained, and had the
14   responsibility to be maintained by Tesla, and so I
15   only asked Tesla because, based on the work
16   structure, I knew that Tesla is who would have access
17   and who had the responsibility for that as the joint
18   employer, so I knew that that's who would have it.
19       And because they took the adverse action
20   and they did all the things afterwards, that's who I
21   needed to deal with based off of what they did
22   after -- after that point.
23       So I only dealt with Tesla at that point
24   because that's where all the action was and that's who
25   had control. It wasn't -- if -- if it would have been

154

1 the other way around and it would have been Balance
2 who had power over Tesla, and then they took the
3 adverse action, they did all that stuff, then I would
4 have dealt with Balance because they would have had
5 been in the power position and they would have had all
6 the records.
7       But Tesla was the one who did all of that
8 and who I knew had the records and who maintained
9 control and did all that kind of stuff, so I knew that
10 that's who I need to deal with for that purpose. And
11 because they took the adverse actions afterwards, they
12 were the ones who created the harm towards me.
13       So the personnel file was important in that
14 context before the adverse action just because I
15 wanted to solve the problems that I was telling you
16 about, but afterwards they became even more important
17 because that was the basis by which they took adverse
18 action on me.
19       So the blackballing and the things that are
20 still ongoing right now that are creating harm in
21 today, that was based off of things that would be
22 partially represented in a personnel file if
23 accurately maintained. So that was why that became
24 even more important within that three-year time
25 period.

155

1 Q.  Okay. Are you aware that you are entitled to request
2 those employment records from Balance Staffing?
3 A.  Yes, but they -- they weren't -- especially when I
4 reviewed the email, they weren't -- they -- they
5 weren't in the driver's seat, you know. When you
6 look at it, it -- you know, the decision-making and
7 the leadership all came from Tesla's side.
8       So -- so the things that happened, they
9 were from it -- it would be like, you know -- there's
10 certain things in a game that are like the opposing
11 team and your team, and there are certain things that
12 are when the ref made a bad call or something.
13 Right? But to -- to ask the ref to do something
14 where he's dealing with the other team, that -- it's
15 almost like they're not really a part of what that
16 issue is. That's dealing with -- you know, the issue
17 here is between me and Tesla about the records that
18 Tesla maintained.
19       Now, the other stuff came -- was a part of
20 it then that would be relevant, but because it's not
21 relevant and because it wasn't them initiating adverse
22 action or them calling me a criminal or them -- you
23 know what I mean? They -- all that stuff came from
24 Tesla's side.
25       So because all that stuff came from Tesla's

156

1 side and it wasn't even -- they weren't really even a
2 part of the conversation in that way, it -- it doesn't
3 make any sense to even involve them in that part of
4 it. This is -- this is Tesla stuff.
5 Q.  Okay.
6 A.  That probably don't --
7 Q.  We'll go --
8 A.  That employment -- excuse me for interrupting, but
9 it's their -- as a joint employer, and the
10 controlling joint employer in the relationship, it
11 was primarily their responsibility for all those
12 things that happened, so that's why I'm addressing
13 them.
14 Q.  Okay. Did Tesla ever represent to you that it was
15 your joint employer?
16 A.  It -- yes. So in -- in both in actions and in words.
17 Right? So when they --
18 Q.  But not in actions. I'm saying, did Tesla ever
19 represent to you that it was your employer of record
20 in the same way that Balance Staffing represented to
21 you that it was your employer of record?
22 A.  Well -- well, let me -- let me answer the question
23 like this. So from the very first day -- when you
24 look at --
25 Q.  Sorry, Mr. Austin, I don't want to -- I don't want to

157

1 make this a trick question. I just really want to
2 know if anybody at Tesla told you that it was employer
3 of record.
4       I understand that your theory is that Tesla
5 is a joint employer under the joint employer doctrine.
6 I get all that. Right? But I'm just wondering if
7 you're actually alleging that Tesla specifically told
8 you that you were a full-time employee and not a
9 contractor.
10 A.  Oh, no, no. So that's not what I'm saying.
11 Q.  Okay.
12 A.  Because if I was a full -- if I was a full-time
13 employee, they wouldn't be my joint employer, they
14 would be my employer.
15 Q.  Right.
16 A.  My singular employee.
17 Q.  Got it. That's all I wanted to confirm.
18 A.  Yeah, yeah, yeah. So I was their -- what I was
19 representing is that they represented themselves as a
20 joint employer based off of all of the standards of
21 joint employment, but they --
22       You know, I was -- you know, Balance
23 Staffing wouldn't even be a part of the conversation
24 at all if I had been a full employee of Tesla. It
25 would have just been Tesla.

162

1      They're telling me we don't have a good
2 faith toward you because we're not putting our best
3 foot forward to at least meet you halfway. We're not
4 even doing what our employment policies say to do, you
5 know, because sometimes they can write in nebulous
6 language. The employment policies are on my side.
7 They -- they make my arguments for me in a lot of
8 ways.
9      And when I followed them, they did the
10 exact opposite. Even going as far as making up, you
11 know, lies and pretext to justify the adverse actions
12 that came afterward. So blackballing is in bad faith
13 because it wasn't based off of truth.
14      It was -- it was made up of lies, and they
15 just wanted to retaliate, and the blackball
16 afterwards. So those are -- off the top of my head,
17 those are some of the things that, when you ask, why
18 do I think they operated in bad faith, is because they
19 did all these things outside of the expectation of the
20 employment relationship that all signaled that, that
21 all signaled that they had ill will or evil intent in
22 some way or another towards me as a person because
23 they didn't have to do that.
24      You know, if they -- if they genuinely
25 thought I did something wrong, they could have asked

163

1 me the question first. They could have followed up.
2 They could have, you know, gave me a warning if they
3 thought something -- you know, even a warning
4 without -- with the presumption is still presumptive,
5 but it's -- it's not to the extreme of trying to
6 destroy somebody's reputation and their employment
7 future.
8      Labeling somebody a criminal and that's the
9 reason why you separated employment from them is a --
10 is a severe reaction to something that you have no
11 basis on when that person is the one who brought the
12 complaint forward. It's a -- it signals bad faith all
13 the way around, from my vantage point.
14 Q.  Okay. And it sounds like -- and please correct me if
15 I'm wrong -- but you're -- you're referencing all of
16 the issues that you previously testified to in support
17 of your claims, the retaliation, discrimination,
18 harassment, and the labor code section, you're
19 reasserting them to support your bad faith claim.
20 Correct?
21 A.  Yeah. That's -- that's part of it. Right. But
22 the -- but the --
23 Q.  Okay.
24 A.  But the difference with, I think, the bad faith cause
25 of action in an employment context is that it's

164

1 something that's external to the traditional
2 employment relationship that it's -- that -- that
3 signals ill towards that person. Right? That
4 violates the covenant of good faith and fair dealing.
5 So it's not -- it's not in the traditional employment
6 relationship -- discrimination is not an expected
7 part of the traditional relationship.
8      So because that's external to the
9 traditional relationship that's a factor that someone
10 has to go out of their way to do, right, then -- then
11 that signals the ill will towards them. I'm not
12 saying it's identical, but I'm saying that -- that
13 intent, that retaliatory intent, that discriminatory
14 intent, those -- those steps that were taken, they
15 were not -- they were -- they were with full knowledge
16 and with wilfulness, says that we don't have goodwill
17 towards this person. So I'm not just reasserting the
18 same causes, but I'm saying that those factors --
19 Q.  No, I mean, not the causes, but the -- the issues --
20 the issues --
21 A.  Yeah.
22 Q.  -- that you're highlighting. Because I'm going to ask
23 you -- I don't want to -- I don't want you,
24 Mr. Austin, to have to say these things over and over
25 again. So I'm going to ask you about the causes of

165

1 action for gross negligence, negligence per se, and
2 deceit.
3      I assume that you're going to be
4 reincorporating the issues and the alleged actions
5 that you -- that you testified to for your other
6 causes of action for these courses of action as well.
7 Correct?
8 A.  To a certain degree, but the gross -- the negligence
9 per se deals with the violation of statute. Right?
10 So there's certain -- like, the 1198.5, that gives a
11 precise thing that says if the worker asks a joint
12 employer for their personnel file in 30 days, they
13 have to produce it. Right?
14      It's not -- it's not like a, you should,
15 whatever. It's a per se violation to not produce it
16 in that time period. And if you don't produce it in
17 that time period, there's a statutory fine that's
18 associated with it. Right?
19      So that -- when -- when I'm getting into
20 per se, there's labor code, both at the Federal and
21 State level, and there's health and safety code stuff
22 where it -- those are -- they -- they violated the
23 statute itself. It -- it's also, you know, a part
24 of, you know, the labor code argument as well, but
25 the -- the difference is, is that the per se

---

**170**

1   Q.   I think we got it. I don't want you to have to keep
2     repeating yourself, Mr. Austin.
3   A.   Okay. Sure.
4   Q.   Could we go to number -- the last cause of action for
5     deceit?
6   A.   Yeah.
7   Q.   What's the basis of your claim for deceit?
8   A.   Yeah, so it was -- it was a lot of, I'm going to tell
9     you one thing and I'm going to do another, right,
10    throughout the -- throughout the -- the joint
11    employment relationship.
12       I used -- some of the examples I used
13    before, I mean, straight up I asked for the hours to
14    be corrected, he told me he would. Mr. Mendiola,
15    Mr. Anderson, escalate it to Mr. Woodard; escalate it
16    up the chain of command to Tesla. Nobody corrected
17    it.
18       I asked for the personnel files to see, and
19    all the time I could view it, it was never corrected.
20    I asked for personnel files, I was told I was going to
21    get them, told it, told it, told it, never got it,
22    never produced until it was Court-ordered.
23       I asked for my injury records, they knew I
24    was injured, I had an augmented work schedule based on
25    injury. Right? I even signaled so when other

**171**

1    managers came from different departments who weren't
2    familiar with me -- because I knew I had a good
3    performance review, I didn't want any kind of negative
4    perception -- so I put -- as you mentioned, I put some
5    of the -- I had bandages internally, or support, knee
6    braces and all that kind of stuff internally, that I
7    put on underneath, and then I had stuff that I put on
8    the outside, so if they just looked at me and they
9    didn't know me, just like I'm, you know, looking at
10    people and I'm hearing them say the N-word and I know
11    him, they can at least see, oh, he's injured. He
12    see -- you know, I see he's bandaged up. That's why
13    he's sitting down. You know that I mean?
14       So I went out of my way to try to do that.
15    But the deceit was because I -- the more -- it seemed
16    like the more forthright I was, the more dishonest
17    leadership was. So the more I documented and said,
18    hey, on this day I need to do this, blah, blah, blah,
19    the more they said one thing to me and one thing
20    behind me back. And the documents you produced
21    reaffirm that they were, you know, being two-faced and
22    deceitful throughout the time there.
23   Q.   Okay.
24   A.   But I will say this, though, even -- even in the
25    deceitfulness, they never said -- they -- what didn't

**172**

1    come out is, George is a horrible worker; or George
2    is always late; or George is -- you know what I mean?
3    Like, none of that -- there's no bad stuff in that
4    context.
5       But what they were deceitful about was
6    stuff where they had legal responsibilities to do,
7    and when I made complaints, informal and formal, they
8    should have been corrected, but they lied to get out
9    of their responsibility to correct them, so they
10    were -- they were presenting themselves as a
11    law-abiding, you know, company that wants to change
12    the world, and they were not willing to even follow
13    the basic minimum standards in the labor code and
14    health and safety code, and that kind of stuff, when
15    it came to me.
16   Q.   Okay. Anything else that you allege in support of
17    your claim for deceit?
18   A.   Yes. So the basis that the adverse action was based
19    off of was deceitful. Right? So it was a lie. You
20    know, I never -- I mean, literally, in my entire
21    professional career, I've never recorded anybody.
22    I've been recorded when I worked in the senate. You
23    know, that was a normal part of the thing when I was
24    sitting on the committee and --
25   Q.   Okay. I got it. I got it, Mr. Austin. Your position

**173**

1    is, is that you believe --
2   A.   That I never --
3       [Simultaneous Speaking]
4   Q.   -- it was a false statement that Mr. Woodard had made
5    that you had recorded somebody. Is that correct? And
6    that's the basis for you -- that's another basis for
7    your deceit claim?
8   A.   Yeah, but it's -- the basis is not just the false
9    statement of, you recorded somebody, but it's that --
10    it's that you violated penal code and thus you're a
11    criminal and thus we're justified in doing all this.
12    That's all deceit. Right?
13       So each element and the followup was --
14    was all dishonest and was all from a knowingly
15    dishonest place. It wasn't like they thought I did
16    something bad. They knew I didn't do that. Right?
17    And they -- they saw me -- he saw me taking hand
18    notes when we had a conversation, so I don't know
19    where they -- where that even comes up in terms of
20    why that would even be even a part of the
21    conversation. It never -- it never even emerged when
22    I was making the complaint.
23       So usually if I have a complaint against
24    somebody, I know, you know -- I conducted some of
25    these meetings where, you know, there's two people

286

1  doing was I was making clear that I didn't have any
2  problems with them. I was making sure that they knew
3  that I was aiming elsewhere and I wasn't trying to
4  step on anybody's toes; I wasn't trying to one-up
5  anybody; I wasn't trying to go behind people's backs.
6  I was going out of my way to be forthright about who
7  I am and what I'm working on right now, so that --
8  Q.  So you wanted -- you wanted all these people to know
9      that you were suing this defendant. Yeah?
10 A.  So what I wanted people to know is that I didn't
11     have that -- that I was aboveboard and that I was
12     dealing with people in a very straightforward manner.
13         And what one of the folks advised me of
14     is, is it's not relevant. Don't even worry about it.
15     So it's not relevant. One of the leadership at Tesla
16     told me, don't -- you know, I appreciate you sharing,
17     but it's not relevant. So it's not relevant.
18 Q.  Okay.
19         MR. KIM: Let's go off the record.
20         VIDEO TECHNICIAN: We are going off the
21     record. The time is 20:55.
22         (Off the record at 8:55 p.m.)
23         (Back on the record at 8:57 p.m.)
24         MR. KIM: Okay, let's go back on.
25         VIDEO TECHNICIAN: We are back on the

287

1  record. The time is 20:57.
2         MR. KIM: Okay. So I have no further
3  questions subject to the very many discovery disputes
4  that have been memorialized on the record.
5         Mr. Austin and I will try to continue to
6  meet and confer, but most likely we will need to go to
7  motion practice on that, so I will be keeping the
8  deposition open subject to the resolution of those
9  discovery issues. But for today, we'll be ending the
10 deposition. And we can go off the record.
11         VIDEO TECHNICIAN: All right. This
12 concludes the deposition of George Jarvis Austin. The
13 time is 20:58.
14         (Off the record at 8:58 p.m.)
15         (Proceedings concluded at 8:58 p.m.)
16
17
18
19
20
21
22
23
24
25

288

1           CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF OAKLAND )
5
6           I, ALISON WEBSTER, certify that the
7  deposition of GEORGE AUSTIN was taken before me via
8  videoconference on the date hereinbefore set forth;
9  that the foregoing questions and answers were
10 recorded by me stenographically and reduced to
11 computer transcription; that this is a true, full,
12 and correct transcript of my stenographic notes so
13 taken; and that I am not related to, nor of counsel
14 to, either party nor interested in the event of
15 this cause.
16
17
18
19 _____
20 ALISON C. WEBSTER, CSR-6266, RPR, RMR, CRR, RDR
21 Notary Public, Oakland County, Michigan
22 My commission expires: May 1, 2029
23
24
25